HURST (WILSON v.). See Cases Nos. 17,-808 and 17,809.

## Case No. 6,941.

### HURTIN v. PHOENIX INS. CO.

[1 Wash. C. C. 400.] [1]

Circuit Court, D. Pennsylvania.  April Term, 1806.

MARINE INSURANCE—CAPTURE· OF VESSEL—ABANDONMENT.

1. Action on two policies of insurance; one a valued policy on the vessel, the other an open policy on the cargo; on a voyage from New-York to Gibraltar.—The vessel was captured, and carried into Algesiras; and there, although the cargo was not condemned, as it was not permitted to the vessel to sail with it, unless security was given that it would not be carried to a British port in the Mediterranean, it was sold by the supra-cargo; and the vessel, which had not been detained with a view to her condemnation, sailed for New-York, with a cargo on freight, and was lost. It is not necessary to disclose to the underwriters on the cargo, the particular language of the bills of lading; and if they are general, so as to comprehend the port to which insurance is made, it is sufficient.

2. The seizure and carrying into Algesiras, and the prohibition to carry the cargo away without security, was a complete destruction of the voyage, and authorized an abandonment of the cargo.

3. The sale of the cargo by the supra-cargo, if he acted for the interests of all concerned, was proper; and he had a right thereby to convert a partial into a total loss.

4. The insured must, within a reasonable time after notice of the loss, make his election, and give notice of his intention to abandon; but he may take a reasonable time to decide upon the subject.

5. The refusal to give a deed of cession of the cargo. unless the defendants would accept the abandonment of the vessel, insured in another policy, did not vacate the abandonment of the cargo. A deed of cession is not necessary to transfer to the insurers the right to the property, the same being completely transferred by the abandonment.

6. The vessel not having been detained with a view to condemnation, and the inhibition of exportation of the cargo, but upon security, not affecting her; the assured had no right to recover for a total loss.

7. The assured not having abandoned the vessel at the time he abandoned the cargo, and having at that time refused to do so; his right to make the same is gone, and cannot be regained.

8. In case of abandonment, the underwriter is entitled to all the proceeds of the thing abandoned, and to all the profits arising from the investment thereof.

[Cited in Allegheny Ins. Co. v. Ransom, 69 Pa. St. 498.]

9. The expenses incurred by the detention of the vessel at Algesiras, are subjects of general average; but her repairs are entirely chargeable to the vessel, the cargo having been previously landed. All repairs made necessary by any of the risks insured against, must be paid by the underwriters.

[Cited in Hurtin v. Union Ins. Co.. Case No. 6.942; King v. Delaware Ins. Co., Id. 7,-788.]

This was an action on two policies; one on the Monongahela Farmer, and the other on her cargo, from New-York to Gibraltar; the former a valued, and the latter an open policy. The vessel sailed on the voyage insured, and was seized by two Spanish privateers, in the Gut of Gibraltar, and carried into Algesiras, where attempts were made to condemn her cargo, but without success; the cargo consisting of articles in general contraband of war, but within the exceptions of the treaty between Spain and the United States. The government consented, that the captain should depart, upon his giving security, not to carry the cargo to any British port in the Mediterranean. The supra-cargo, under these circumstances, considering it most for the advantage of all concerned, to dispose of it at Algesiras, procured this to be done, under an order from a judge; and the sales amounted to about half the sum insured on it. The detention produced by this step, kept the vessel at the port of Algesiras, from about the 13th of May, till the 17th of July; during which time, the supra-cargo, by means of a credit, which the plaintiff had given to him, on certain merchants there, purchased a brig and cargo, and sent her to the United States. About the 17th July, he went with the Monongahela Farmer, to Malaga, where he took in a cargo of wines, on freight to New-York; but she was lost, returning to the United States. On, or before the 30th July, in the same year (1805), the plaintiff received notice of the capture, in two letters from the supra-cargo, of the 21st May and 11th June; which stated, that he had been cleared, on condition of not going to any British port in the Mediterranean; advising him to abandon the cargo, and that the vessel would return with a cargo of Malaga wine, on freight, and advising him to insure her. On the 30th July, the plaintiff wrote to Macky, his agent, in Philadelphia, to abandon the vessel and cargo. Macky, after perusing the letters from the supra-cargo, advised him not to abandon the vessel, as he would thereby lose the freight she would earn from Malaga. The plaintiff, in answer to this letter, on the 3d August, desires him to abandon the cargo; observing, that if he should do so, as to the vessel, he should lose the freight. On the 5th. the agent went to the office. and gave in a written abandonment of the cargo; and showed the two letters, from the supra-cargo

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

to the plaintiff. The president inquired if he did not mean to abandon the vessel; to which he answered, that he had no orders to do so. The abandonment was accepted in writing, and the president agreed to pay the loss; but required that the plaintiff should send on a regular cession, proofs of property, and a full disclosure of all circumstances respecting the loss, and respecting the vessel and cargo on the voyage. This answer was immediately communicated to the plaintiff, who, having now determined to abandon the vessel also, wrote on the 6th to his agent, to do so, and agreeing to send on a cession of the cargo, as demanded by the company; provided they would agree to accept the abandonment of the vessel also. The company refused the abandonment of the vessel; and, considering the refusal of the plaintiff to make a cession, as a waiver of his abandonment of the cargo, they declared themselves exonerated from their former acceptance of it, and refused to pay the loss on the vessel or the cargo. The objections to the recovery were, 1st, that the insurance was on a voyage to Gibraltar, and that the bills of lading were to the Mediterranean generally; which circumstance, probably, produced the seizure and detention; and being therefore material to the risk, it ought to have been disclosed, that she was to take a general bill of lading. 2d. That the loss of the cargo was not total, as the supra-cargo was at liberty to go to any other port in the Mediterranean, except a British port, and the loss being thus partial; the supra-cargo had no right to make it total, by a voluntary sale at Algesiras. 3d. That the vessel could not be abandoned, as she was at liberty at all times to pursue her voyage, and did in fact take in a cargo, on freight, for the United States. 4th. That, if the plaintiff had a right to abandon, he had not done so in a proper manner, or in proper time. As to the cargo, the refusal to make the cession, was a waiver of the abandonment, made and accepted on the 5th; and, it was the usual practice in Philadelphia, to make formal cessions in writing, of property abandoned. As to the vessel, the plaintiff elected not to abandon: and, when he changed his mind, it was then too late: nor was it done in due time. 5th. That the brig and cargo, purchased at Algesiras, were purchased with the proceeds of the cargo of the Monongahela Farmer; and, if the plaintiff had a right to claim for a total loss, the defendants were entitled to credit for the proceeds of that vessel and cargo. 6th. That, at any rate, the proceeds of that cargo, ought to be considered, so far as it goes, to have been invested in that purchase, to the amount of which investment, the defendants were entitled to credit; notwithstanding it appears, by the account rendered, that a great part of it was laid out in repairs of the Monongahela Farmer at Algesiras; and because, it is improperly made a charge against the cargo. Cases cited: 1 Esp. 237; Duncan v. Koch

[Case No. 4,136]; Craig v. Murgatroyd [4 Yeates, 161]; 2 N. Y. Term R. [2 Caines] 290; 3 C. Rob. Adm. 240.

Mr. Ingersoll, for plaintiff.
Rawle & Hallowell, for defendants.

WASHINGTON, Circuit Justice (charging jury). The first objection, if well founded, goes to the destruction of both policies; but, it appears, that, as it is usual to carry general bills of lading, if you should be satisfied of this, then the assured was not bound to mention the circumstance. It would rather seem, that the risk was lessened, than increased, by having a general bill of lading. But, if it is unusual to carry such bills, you are the proper judges, whether the not disclosing the circumstance, was material to the risk. The important question is, whether the plaintiff can recover, as for a total loss on the vessel and cargo, or either; and, in considering each case, it will be proper to inquire, first, whether the plaintiff had a right to abandon; and, secondly, whether the abandonment was made in a proper manner, and was effectual.

As to the cargo. 1st. Had the plaintiff a right to abandon? The cargo was destined for Gibraltar, but was captured and carried into Algesiras, from whence it could not be removed without security being given, not to carry it to a British port. This amounted to a complete destruction of the original voyage; and it appears, that the supra-cargo, who, upon the spot, must have been the best judge what it was most prudent to do, considered it most for the benefit of the parties concerned, to sell it there, under the sanction of the government. It does not appear that he could have done better, had he gone elsewhere; but, even if he could, he was not at liberty to leave the port, without giving security not to carry the cargo to a British port. He was the agent of the assured; and, I admit, that as such, he could not, without necessity, convert a loss, but partial in its nature, into a total loss. But, here the voyage was broken up; it could not be further prosecuted; and, if he acted for the best, for all concerned, of which you are the judges, then the loss became total, and the plaintiff had a right to abandon.

2d. It is true, that, as soon as the assured receives notice of the loss, he must make his election to abandon or not; and, in the former case, he must, within a reasonable time, give notice of his intention. What is a reasonable time, must always depend upon circumstances, to be judged of by a jury. If he waits a reasonable time to obtain advice, whether he may legally abandon or not, the delay, being in all respects fair and bona fide; it might well enter into the consideration of the question, whether his determination was communicated in due time. There may be other circumstances. But, if he waits with a view to place the loss on the under-

writer, as events might turn up to render it prudent or otherwise, although he at last determines, before he has received any further information on the subject; the delay would be less excusable. Now, in this case, the plaintiff made an absolute abandonment of the cargo, within five days after he appears to have received notice of the loss, which was accepted. It is said, however, that his refusing to make a cession, except upon terms with which the insurers were not bound to comply, amounted to a waiver of the abandonment. If a cession, as it is called, had been necessary to make the abandonment complete, there might be something in the argument. But, this is not the case. The abandonment amounts to a legal transfer of the right of the insured, so as to enable the underwriters to pursue, to manage, and to recover the property, as effectually as if a regular deed had been made to them. It is said to be the uniform practice in Philadelphia, for the insured to make a formal conveyance. This may be so; because, I presume it is never objected to. But, when it comes to be made a question, whether the abandonment is invalid, if the cession is refused, we must say it is not; because, such an instrument is not necessary to pass the right of the insured to the underwriters. The refusal, therefore, of the plaintiff to execute such an instrument, did not affect the prior abandonment, which had been made and accepted. It appears, that he was ready to send forward all such papers, as might be required to prove the property. Upon the policy on the cargo, therefore, the plaintiff has a right to recover for a total loss.

Next, as to the vessel—

1st. Had the plaintiff a right to abandon? It is true, the vessel was detained for a short time, with a view to condemnation; but soon after, the captain was at liberty to go where he pleased with her; but he could not take the cargo with him, without giving security, not to carry it into a British port in the Mediterranean. If the captain had landed his cargo immediately, there was nothing to prevent the departure of the vessel, which was in perfect safety, free from injury by any of the perils insured against, except a temporary interruption. It is said, that the voyage was broke up. As to the cargo, it was; and therefore the underwriters, on that and on the freight, are answerable; but this is nothing to the underwriters on the vessel. Suppose she had been met with at sea, by pirates, and plundered of all her cargo, and then dismissed; would the underwriters on the vessel be answerable, because the object of the voyage was put an end to? Certainly not. But it is contended, that she was detained for two months at Algesiras, as is proved by the depositions of the supra-cargo and mate. The conclusive answer is, that the same letters, which informed the plaintiff of the loss, informed him also, that the vessel was clear, and would proceed to Malaga, to bring home a cargo of wine; and the supra-

cargo, to prove his idea of her safety, desired the plaintiff to abandon only the cargo. Knowing, therefore, that the danger was over, at the same time that he knew of the capture, it was not competent to the plaintiff to abandon. But, if these letters had informed the plaintiff, that the vessel was still detained, so as to authorize an abandonment, the plaintiff is not entitled to recover, as for a total loss on her; because, 2dly, the abandonment was not made in proper time, and in a proper manner. As soon as the insured hears of the loss, he should make his election, and communicate to the underwriters his determination to abandon, if he chooses it. But if he makes his election not to abandon, and particularly, if he communicate this determination to the underwriters, he cannot afterwards change his mind, and say, he will abandon; and thus throw the whole loss on the underwriters. And here is the difference between the vessel and the cargo, in the present instance. In the latter case, he made his election promptly, to abandon, and it was accepted. In the former, he first determined to abandon all; but adopting the advice of his agent, he directed him to abandon only the cargo; assigning the very reason, which should prevent him from afterwards changing his mind, namely, that he should, by giving up the vessel, lose the freight, which the letter from the supra-cargo induced him to accept. This letter, confining the abandonment to the cargo, was shown to the defendants, on the 5th, at the time the abandonment of the cargo was accepted. The plaintiff knew that he had barred himself of a right to abandon the vessel, by stipulating, afterwards, the acceptance of it, as the condition of his making a formal cession of the cargo. The plaintiff, therefore, cannot recover on the vessel, more than for any partial loss, which he may prove.

5th point. The argument, that the underwriter, in case of abandonment, is entitled to the proceeds of the thing abandoned, and if they be invested by the agents of the insured, in other articles which produce a profit, to those profits also, is well founded, but does not fit this case. It is clearly proved, and was at first admitted, that the brig and her cargo, purchased by the supra-cargo at Algesiras, was paid for, by bills drawn on the plaintiff, and by money received on letters of credit; the defendants at first supposed, and insisted, that this brig and her cargo should be accounted for. But it would seem, that they were afterwards satisfied upon this subject.

6th. It is contended, that the money for which the cargo was sold, is stated to have been laid out in the repairs and expenses of the vessel, at Algesiras, which could not legally be done; and therefore, that sum, at least, must be considered as invested in the purchase of the brig and cargo, to the proceeds of which, the defendants are entitled. Whether the cargo could, or could not, be

charged with the repairs and expenses, it is a sufficient answer to this claim, that they were in fact appropriated to the making of these repairs; and therefore could not also have been invested in the purchase. It is not enough to sanction the claim, to say, that they might have been so invested; it cannot be supported, unless it appear, that in reality they were so invested, for the benefit of the insured, or for the concerned. It, however, becomes a necessary question, what part of the proceeds of the cargo sold at Algesiras, is to go to the credit of the defendants. It appears, by the account, that the expenses, incurred during the detention at Algesiras, amounted to between four and five hundred dollars; and that the repairs of the vessel exceeded the sales of the cargo. As to the former, that may properly be a subject of general average; but as to the latter, they are certainly not chargeable against the cargo, either in toto, or as general average; since, being landed at Algesiras, it was to receive no benefit from the future repairs of the vessel. They may be charged to the ship, if they were rendered necessary, from any of the risks mentioned in the policy; and as the defendants are underwriters, on both ship and cargo, it will come to the same thing.

The counsel agreeing, that if the jury should find for a total loss on the cargo, and a partial loss on the ship, the adjustment would be made by consent, the jury found accordingly.
[For a similar trial, see Case No. 6,941.]

NOTE. See Scriba v. Insurance Co. of North America [Case No. 12,560]. The court determined, that the protest of the captain, could not be read in evidence by either party.